# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

OSCAR J. WILKIE, JR.,

        Plaintiff,


v.
                      **MEMORANDUM OF LAW & ORDER**
                      Civil File No. 10-2308 (MJD/LIB)

JULIE SAVAT individually, and
in her capacity as the Clay County
Jail Administrator, et al.,

        Defendants.

---

DeWayne A. Johnston, Johnston Law Office, Counsel for Plaintiff.

Jon K. Iverson, Susan M. Tindal, and Amanda L. Stubson, Iverson Reuvers, LLC, Counsel for Defendants.

---

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Dismissal or for Summary Judgment.  [Docket No. 23]  The Court heard oral argument on April 13, 2012.

## II.    BACKGROUND

### A.    Factual Background

1

### 1.     Arrest

During the evening of Thursday, October 16, 2008, Plaintiff Oscar J. Wilkie, Jr. consumed alcohol and then got into a fight with an unknown individual. (Tindal Aff., Ex. A, Wilkie Dep. 9-11.)  During the fight, Wilkie was struck with a tequila bottle on the left side of his face.  (Id. 11-12.)  Wilkie then walked across the parking lot to his home.  (Id. 12.)

During the early morning of Friday, October 17, 2008, Wilkie left his home and drove to visit his girlfriend, who was going to go to the hospital with him. (Wilkie Dep. 12-13.)  Moorhead Police Officer Shawn Krebsbach observed Wilkie's vehicle driving erratically.  (Krebsbach Aff. ¶ 2.)  Krebsbach stopped Wilkie's vehicle.  (Id. ¶¶ 3-6.)  Wilkie admitted that he had a suspended driver's license.  (Id. ¶ 6.)  Krebsbach then noticed a smell of alcohol, and Wilkie admitted drinking.  (Id. ¶ 7.)

Wilkie failed the Field Sobriety Tests and was arrested for driving while intoxicated and transported to Defendant the Clay County Jail.  (Krebsbach Aff. ¶¶ 9-10.)  At the jail, Wilkie took an Intoxilyzer test and blew a .19.  (Id. ¶ 10.)  At no time during Wilkie's interaction with Krebsbach or during the booking process did Wilkie indicate that he was injured, in pain, or needed medical attention.  (Krebsbach Aff. ¶ 11; Wilkie Dep. 16 ("Q. Did you tell the police

2

officer that you were hit with a bottle? A. I don't believe I said anything to the

police officer while I was in the cop car."), 17-19 (testifying that he does not recall

what he said or did not say during the booking process).)

### 2.    Booking

Wilkie was booked at 1:53 a.m. on Friday, October 17, 2008, by Corrections

Officers Dale Near and Tasha Kay.  (Kay Aff. ¶ 2.)  Near went over the jail's

medical intake form with Wilkie.  (Id. ¶ 3; Kay Aff., Ex. A, Medical Intake Form.)

Wilkie did not inform Near or Kay that he was injured or in pain.  (Kay Aff. ¶ 4;

see also Wilkie Dep. 17-19 (testifying that he does not recall what he did or did

not say during the booking process).)  When Kay observed a cut on Wilkie's

nose, he told her that a dog jumped at his face and caused the cut.  (Kay Aff. ¶ 5.)

Wilkie also told Kay that he had arch and back problems and cavities.  (Id. ¶ 6;

Medical Intake Form.)

During the booking process, Wilkie was given a copy of the Clay County

Jail Inmate Handbook.  (Kay Aff. ¶ 8; Kay Aff., Ex. C, Handbook.)  He signed an

acknowledgment form that he had received it, was required to read it, and

would ask for help from a guard if he needed help in reading it.  (Kay Aff., Ex.

D.)  The Handbook states: "Inmates have access to Medical staff five times a

week, Monday thru Friday.  Inmates must put in a request to see the nurse by 0800 on these mornings."  (Handbook, Clay 251.)  It further provides that "[i]nmates have access to 24 hour emergency care."  (<u>Id.</u>)

Wilkie made no written request for medical attention between Friday, October 17, 2008, and Tuesday, October 21, 2008.  (Wilkie Dep. 23.)

After the initial booking, Wilkie was placed in a holding cell due to his intoxication.  (Wilkie Dep. 20.)  He fell asleep.  (<u>Id.</u> 20-21.)  When he awoke, Wilkie asked to see a nurse because he had a "severe headache," but he cannot remember if he told the unnamed officer that he had a "severe headache" or not.  (<u>Id.</u> 21-22.)  The unnamed corrections officer stated that the nurse was busy and he would get back to Wilkie later.  (<u>Id.</u> 22.)

Corrections Officer Darren Schenck completed the booking process for Wilkie at 10:29 a.m. on Friday, October 17.  (Schenck Aff. ¶ 3.)  Schenck administered a breath test to Wilkie, but because his blood alcohol concentration was .068, he kept Wilkie in the holding cell.  (<u>Id.</u>; Wilkie Dep. 24-25.)  Wilkie told Schenck that he was experiencing pain in his face.  (Schenck Aff. ¶ 4.)  Schenck provided Wilkie an ice pack and over-the-counter pain medication.  (<u>Id.</u>) Schenck then administered the breath test again to Wilkie at 2:00 p.m., but he still

4

had alcohol in his system.  (<u>Id.</u> ¶ 6.)  Wilkie testifies that he asked to see a nurse or doctor each time an officer administered the Intoxilyzer test.  (Wilkie Dep. 24-25.)

### 3.    General Population

When Wilkie's blood alcohol was zero, he was escorted to general population.  (Wilkie Dep. 24.)  When he was moved, he asked the corrections officer to see the nurse.  (<u>Id.</u> 26.)  The unnamed officer stated that the nurse was gone for the day or the weekend.  (<u>Id.</u> 26-27.)  Wilkie did not explain why he needed to see a nurse. (<u>Id.</u> 27.)

Wilkie testifies that, over the weekend, while he was in general population, he asked to see the nurse whenever a new corrections officer would make rounds.  (Wilkie Dep. 27-28.)  Wilkie testifies that he never told anyone at the Clay County Jail why he wanted to see the nurse.  (<u>Id.</u> 28.)  He asserts that it was obvious because he "had two black eyes.  [His] nose was swollen.  [His] face was swollen."  (<u>Id.</u> 28-29.)  Corrections officers told him to wait until Monday. (<u>Id.</u> 28.)  They gave him ibuprofen and ice packs.  (<u>Id.</u> 29, 31.)

### 4.      Transfer to Wilkin County Jail

Wilkie was transferred to the Wilkin County Jail on Monday, October 20 because the Clay County Jail was overcrowded.  (Wilkie Dep. 32; Johnson Cert., Masseth Letter at Clay 9.)  Before Wilkie left, he asked Clay County jail staff if he could see a nurse.  (Wilkie Dep. 33.)  They told him to wait until he was booked into Wilkin County and see the nurse there.  (Id. 33.)  At 10:40 a.m., Deputy Jeff Evenson transported Wilkie and two other inmates to the Wilkin County Jail.  (Evenson Aff. ¶ 2; Evenson Aff., Ex. A.)  Wilkie did not have any conversation with Evenson regarding his medical condition or desire for medical attention.  (Evenson Aff. ¶ 3; Wilkie Dep. 34.)

During the booking process at the Wilkin County Jail, Wilkie asked the booking officer if he could see the nurse.  (Wilkie Dep. 34.)  The nurse then came and looked at his injuries.  (Id. 35.)  She provided him with over-the-counter pain medication and an ice pack, the same treatment that he been provided at the Clay County Jail.  (Id.)  Wilkin County officials contacted Defendant Miriam Masseth, the Clay County Jail Programs Director, because Wilkie had told them that he was in pain and wanted to be seen by a doctor.  (Masseth Letter at Clay 9; Masseth Aff. ¶ 2.)  Masseth asked the Wilkin County officer whether Wilkie required emergency medical attention, and the officer stated that Wilkie did not

require medical attention that day.  (Masseth Aff. ¶ 3.)  Masseth arranged for a

Clay County officer to pick Wilkie up the next morning, Tuesday, October 21,

and take him to the emergency room.  (Id. ¶ 4.)  Masseth avers that this

conversation was the first time she was aware of any medical issue with Wilkie.

(Id. ¶ 5.)

### 5. Surgery

On Tuesday, October 21, 2008, Clay County Deputy Thane Zimmerman

transported Wilkie from the Wilkin County Jail to MeritCare Hospital.  (Masseth

Letter at Clay 9; Zimmerman Aff. ¶ 2.)  Wilkie had a black eye and told

Zimmerman that he had been injured before his arrest.  (Zimmerman Aff. ¶ 3.)

At MeritCare, the doctors diagnosed Wilkie with a fractured cheek bone and

broken nose and recommended surgery.  (Id. ¶ 4; Wilkie Dep. 36.)

Pending surgery, Wilkie was transported to the Clay County Jail.  (Wilkie

Dep. 37.)  Wilkie testified that he requested pain medication allegedly prescribed

by MeritCare and was denied, but he could not recall what type of pain

medication it was.  (Id. 38.)  There is no record of any prescription from October

21 or 22 in the record.  (See Moon Aff. ¶ 3.)  He was provided with ibuprofen or

Tylenol and ice packs.  (Wilkie Dep. 41.)

On Thursday, October 23, 2008, Wilkie was taken to MeritCare for surgery, and he was transported back to the Clay County Jail that day.  (Moon Aff. ¶ 4; Wilkie Dep. 43.)  The surgery date had been scheduled by the MeritCare doctor. (Wilkie Dep. 37.)

After Wilkie's surgery, his doctor prescribed oxycodone, to be taken every six hours, as needed, for the pain.  (Johnston Cert., Medical Records ROI, at Clay 320.)  The evening after the surgery, he requested the pain medication from the Clay County nurse and it was given to him.  (Wilkie Dep. 44.)  Four or five hours after he had received the medication from the nurse, he requested it again from an officer making rounds, and Wilkie was told that they would get it to him when they could.  (Id. 45.)  The Clay County Jail officials gave him the medicine approximately two or three hours later.  (Id. 45-46.)

Wilkie is now fully recovered from his injuries and the surgery.  (Wilkie Dep. 54.)  He was never told that having the surgery when he did affected his recovery.  (Id.)

B.     Procedural History

On June 10, 2010, Wilkie filed a Complaint against the Clay County Jail; Clay County, Minnesota; Miriam Masseth, individually, and in her capacity as

the Clay County Jail Program Director; Ryan Mullikin, individually, and in his

capacity as the Clay County Jail Assistant Jail Administrator; and Julie Savat,

individually, and in her capacity as the Clay County Jail Administrator; in this

Court.  The Complaint alleges: Count One: Violation of Wilkie's Eighth

Amendment Rights, based on deliberate indifference to his injuries and a delay

in obtaining pain medication after his surgery; and Count Two: Violation of

Wilkie's Fourteenth Amendment Rights, based on racial discrimination in failing

to provide medical attention to Wilkie for three days based on Wilkie's Native

American race.

Defendants now move for dismissal or summary judgment on all claims

against them.  Because the parties have submitted evidence outside the

pleadings, which the Court has considered, and discovery in this matter has

closed, so the matter is ripe for summary judgment, the Court addresses

Defendants' summary judgment motion rather than their alternative motion to

dismiss.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## B.    Statute of Limitations

The Court denies Defendants' assertion that this action is barred by the applicable statute of limitations.  "The statute of limitations for a § 1983 claim is generally the applicable state-law period for personal-injury torts."  City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 124 n.5 (2005).  "In Minnesota, § 1983 claims are governed by the six-year limitations period of Minnesota's personal-injury statute, Minn. Stat. § 541.05, subd. 1(5)."  Egerdahl v. Hibbing Cmty. Coll., 72 F.3d 615, 618 n.3 (8th Cir. 1995) (citing Berg v. Groschen,

437 N.W.2d 75, 77 (Minn. Ct. App. 1989)).  See also Owens v. Okure, 488 U.S. 235,

249-50 (1989) ("[W]here state law provides multiple statutes of limitations for

personal injury actions, courts considering § 1983 claims should borrow the

general or residual statute for personal injury actions.") (footnote omitted); Berg

v. Groschen, 437 N.W.2d 75, 77 (Minn. Ct. App. 1989).  Plaintiff filed this lawsuit

well within the applicable statute of limitations.

### C.     Whether Clay County Jail Is Subject to Suit

The Court dismisses the Clay County Jail as a Defendant in this matter

because it is not an entity subject to suit.  See, e.g., Owens v. Scott County Jail,

328 F.3d 1026, 1027 (8th Cir. 2003) ("[C]ounty jails are not legal entities amenable

to suit.") (citations omitted).

### D.     Monell Claim against Clay County

#### 1.     Monell Standard

A municipality or other local government may be liable under [§
1983] if the governmental body itself "subjects" a person to a
deprivation of rights or "causes" a person "to be subjected" to such
deprivation.  But, under § 1983, local governments are responsible
only for their own illegal acts.  They are not vicariously liable under
§ 1983 for their employees' actions.

Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citations omitted).

> Plaintiffs who seek to impose liability on local governments under §
> 1983 must prove that action pursuant to official municipal policy
> caused their injury.  Official municipal policy includes the decisions
> of a government's lawmakers, the acts of its policymaking officials,
> and practices so persistent and widespread as to practically have the
> force of law.

Id. (citations omitted).

> [A] municipality may be held liable for the unconstitutional acts of
> its officials or employees when those acts implement or execute an
> unconstitutional municipal policy or custom.  For a municipality to
> be liable, a plaintiff must prove that a municipal policy or custom
> was the moving force [behind] the constitutional violation.

Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citations omitted).

"[A] 'policy' is an official policy, a deliberate choice of a guiding principle

or procedure made by the municipal official who has final authority regarding

such matters."  Id. (citation omitted).  In contrast, proof of a custom requires:

> 1) The existence of a continuing, widespread, persistent pattern of
> unconstitutional misconduct by the governmental entity's
> employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct
> by the governmental entity's policymaking officials after notice to
> the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental
> entity's custom, i.e., [proof] that the custom was the moving force
> behind the constitutional violation.

Id. (citation omitted).

## 2.    Unconstitutional Policy or Custom

Wilkie fails to identify which official Clay County policies are

unconstitutional.  It could be interpreted that Wilkie is challenging the official

policy of requiring a written request to see a nurse, who is available only five

days per week.  However, the official Handbook also states that emergency

treatment is available at all times and does not state that a written request is

required for such treatment.  Wilkie fails to point to a constitutionally inadequate

official policy.

> Under the Constitution . . . the range of acceptable medical care is
> broad.  Jailers bear only the responsibility to identify medical needs
> that are so obvious that even a layperson would easily recognize the
> necessity for a doctor's attention.  Similarly, a policy that results in
> delayed treatment is not unconstitutional unless it evinces deliberate
> indifference to serious medical needs.  The Constitution does not
> require jailers to handle every medical complaint as quickly as each
> inmate might wish.

Jenkins v. County of Hennepin, Minn., 557 F.3d 628, 633 (8th Cir. 2009).  Here,

Wilkie has not met his burden of pointing to a genuine question of material fact

regarding an unconstitutional official policy by Clay County.

It appears that Wilkie asserts a custom that the jail staff withheld

information on how to request medical attention, improperly withheld medical

treatment, or failed to provide the tools necessary to submit a proper request for

medical attention.  However, evidence of unconstitutional conduct with regard to one plaintiff – Wilkie – in one instance – his October 2008 jail stay – is insufficient to create a genuine issue of material fact regarding a persistent and widespread pattern of unconstitutional misconduct.  See Jenkins, 557 F.3d at 634 ("[A] custom can be shown only by adducing evidence of a continuing, widespread, persistent pattern of unconstitutional misconduct. . . .  [L]iability for an unconstitutional custom . . . cannot arise from a single act.") (citations omitted).

There is no evidence in the record that any Clay County policymaking official had notice of the alleged misconduct and was deliberately indifferent to it.  In fact, the record reflects that Masseth had no knowledge of Wilkie's alleged requests for medical attention until after he was transferred to Wilkin County.

### 3.    Failure to Train

Wilkie asserts a failure to train claim.  "A failure to properly train employees is one way in which an entity can exhibit deliberate indifference toward the rights of others."  Turney v. Waterbury, 375 F.3d 756, 762 (8th Cir. 2004).  Wilkie claims that Clay County failed to properly train its employees in first aid and other basic medical education.

14

A city also may be liable for deficient policies regarding hiring and training police officers where (1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by a municipality, and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury.  It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In other words, the plaintiff must demonstrate that the city had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.

Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (citations omitted).

 [T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.

City of Canton v. Harris, 489 U.S. 378, 390-91 (1989).

Here, Wilkie fails to present any evidence of what training Clay County provided to the Clay County Jail employees.  Without that evidence, his claims cannot survive summary judgment.  See Robinette v. Jones, 476 F.3d 585, 591 (8th Cir. 2007) ("[Plaintiffs] present no evidence about [defendant]'s police training and supervision or its relation to the tasks that the officers performed.  Without such facts to demonstrate that there is a genuine issue for trial, the [plaintiffs']

mere allegations that [defendant] failed to train or supervise its police officers cannot defeat summary judgment.") (citations omitted).  Nor does Wilkie articulate what training Clay County should provide.  Wilkie cites to no evidence in the record to support his claim that the County failed to properly train its employees in first aid or other basic medical education.  His failure to train claim must be dismissed.

### E.    The Individual Defendants: Qualified Immunity

#### 1.    Qualified Immunity Standard

"The doctrine of qualified immunity protects the officers from personal liability under § 1983 insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." Baribeau v. City of Minneapolis, 596 F.3d 465, 473 (8th Cir. 2010) (citation omitted).  "To overcome the defendants' qualified immunity claims, the plaintiffs must show that: "(1) the facts, viewed in the light most favorable to the plaintiff[s], demonstrate the deprivation of a constitutional . . . right; and (2) the right was clearly established at the time of the deprivation." Id. at 474 (citation omitted).  The Court can use its discretion to decide which qualified immunity prong should be addressed first.  Id.

The Fourteenth Amendment, rather than the Eighth Amendment, is the proper vehicle for Wilkie's claims as a pre-trial detainee.  See Crow v. Montgomery, 403 F.3d 598, 601 (8th Cir. 2005).  The deliberate indifference standard is the same under either amendment.  Id.

> It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs.  In a deprivation of medical care case, the inmate must show (1) an objectively serious medical need; and (2) the defendants actually knew of the medical need but were deliberately indifferent to it.
>
> An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.  To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk. Rather, a plaintiff must demonstrate the official actually knew of the risk and deliberately disregarded it.  The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious.  If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may held liable for deliberate indifference. However, [a] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions.

Jones v. Minn. Dept. of Corr., 512 F.3d 478, 481-82 (8th Cir. 2008) (citations omitted).

## 2.      Claims against Mullikin and Savat

A plaintiff fails to state a claim under § 1983 when he "fail[s] to allege

sufficient personal involvement by any of defendants to support such a claim."

Beck v. LaFleur, 257 F.3d 764, 766 (8th Cir. 2001).  Wilkie has not sued any of the

Clay County Jail staff with whom he had direct contact regarding his medical

issues.  There is no respondeat superior or vicarious liability under § 1983.  See

City of Canton v. Harris, 489 U.S.  378, 385 (1989).  "[A] general responsibility for

supervising the operations of a prison is insufficient to establish the personal

involvement required to support liability."  Camberos v. Branstad, 73 F.3d 174,

176 (8th Cir. 1995).

Here, Wilkie points to no evidence of direct contact with Defendants Ryan

Mullikin or Julie Savat.  Nor does he demonstrate how they caused the alleged

constitutional violation.

A § 1983 action

predicated on a supervisor's failure to supervise or control his
subordinates may be maintained only if a defendant demonstrated
deliberate indifference or [ ] authorization of the offensive acts.
Under the deliberate indifference standard, a prison official cannot
be found deliberately indifferent under the Eighth Amendment,
unless the official knows of and disregards an excessive risk to
inmate health or safety.  In other words, . . . the official must both be
aware of facts from which an inference could be drawn that
substantial risk of harm exists, and he must also draw the inference.

Tokar v. Armontrout, 97 F.3d 1078, 1083 (8th Cir. 1996) (citations omitted).

Here, Wilkie fails to point to any action by Mullikin or Savat giving rise to

liability, apart from alleging respondeat superior or vicarious liability based on

their supervisory positions, which is not a sustainable theory under § 1983.

Wilkie has failed to allege or point to evidence of any action by Mullikin or Savat

in relation to his medical needs.  Nor does he point to any evidence,

circumstantial or otherwise, that, in their supervisory roles, they knew of his

medical needs, let alone knew of, approved of, or directed others to ignore those

needs.  Therefore the claims against them must fail.

### 3.    Claim against Masseth

The only evidence regarding Defendant Miriam Masseth's knowledge of

or involvement in Wilkie's medical needs is as follows:  On Monday, October 20,

Wilkin County officials contacted Masseth because Wilkie told them that he was

in pain and wanted to be seen by a doctor.  Masseth asked the Wilkin County

officer whether Wilkie required emergency medical attention and the officer

stated that Wilkie did not require medical attention that day.  Masseth arranged

for a Clay County officer to pick Wilkie up the next morning, Tuesday, October

21, and take him to the emergency room.  This conversation was the first time

Masseth was aware of any medical issue with Wilkie.  The hospital then scheduled Wilkie's surgery, and the Clay County Jail arranged for him to be brought back to the hospital for surgery at the scheduled time.  These facts are insufficient to sustain the claim against Masseth.

A serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a layperson would easily recognize the need for a physician's attention.  See Jones, 512 F.3d at 481.  Until he was taken to MeritCare on October 21, 2008, Wilkie had not been diagnosed with any medical issue that required treatment.  Therefore, to survive summary judgment, Wilkie must show evidence that his injuries were so obvious that a layperson would have recognized the necessity for a doctor and that the delay between Wilkie's requests to see the jail nurse and his trip to MeritCare adversely affected his prognosis.

Wilkie must show verified medial evidence that Masseth ignored an acute or escalating situation or that delays adversely affected his prognosis.  See Dulaney v. Carnahan, 132 F.3d 1234, 1243 (8th Cir. 1997).  "The question . . . is not, in hindsight, whether [plaintiff] had a serious medical condition, but rather,

whether the condition was so obvious that a layperson would have easily recognized the need for medical treatment." Jones, 512 F.3d at 483.

Here, there is no evidence that Masseth had knowledge of a serious medical need and disregarded it. The only information regarding Wilkie's medical condition that was conveyed to her was that Wilkie stated that he was in pain and wanted to see a doctor but that, in the opinion of Wilkin County, Wilkie did not need to go to the hospital that day. Based on that information, Masseth arranged for Wilkie to be transported to the emergency room the next day. There is no evidence, circumstantial or otherwise, that Masseth was aware of Wilkie's medical issues before October 20 or that she was aware of Wilkie's few hour delay in receiving pain medication when he returned to the Clay County Jail after surgery. The claim against Masseth must fail.

### F.    Racial Discrimination Claim

In Count Two, Wilkie asserts that a jury could find that the Clay County Jail officials' motives for deliberately failing to meet his medical needs were racially driven because his is Native American. (See Wilkie Dep. 50-51 (testifying that he felt that he was discriminated against because he was not seen by medical personnel over his first weekend at the Clay County Jail but after his Caucasian

cellmate broke his arm during a fight in his cell and his arm swelled up, cellmate was immediately taken to see a doctor).)

"[U]nequal treatment of persons who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." <u>Lewis v. Jacks</u>, 486 F.3d 1025, 1028 (8th Cir. 2007) (citation omitted). "Discriminatory purpose can be proved with various kinds of direct and circumstantial evidence but is most often proved with evidence that similarly situated inmates were treated differently." <u>Id.</u> (citation omitted).

Wilkie has pointed to no evidence of unequal treatment based on race. There is no direct evidence of racial animus. (<u>See</u> Wilkie Dep. 51 (testifying that he was never told he was treated differently because he was Native American and no Clay County Jail staff member ever used a derogatory term to refer to his race).) Wilkie and John Klebe, Wilkie's Caucasian cellmate who was immediately taken to see a doctor after breaking his arm during a fight in the Clay County Jail, were not similarly situated. Klebe was injured while in jail and his injury was obvious. According to Wilkie, Klebe explicitly informed jail staff that he fell and thought that his arm was broken. (Wilkie Dep. 52.) In contrast,

Wilkie was injured before his arrest and did not tell Clay County Jail staff that he

had been injured in a fight before his arrest.  Because, viewing the evidence in

the light most favorable to Wilkie, he cannot show any evidence of

discriminatory intent, he cannot establish a violation of equal protection, and the

individual Defendants are entitled to qualified immunity.

Accordingly, based upon the files, records, and proceedings herein**, IT IS

HEREBY ORDERED**:


1.     Defendants' Motion for Dismissal or for Summary Judgment
       [Docket No. 23] is **GRANTED**.

2.     This matter is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  May 10, 2012                    s/ Michael J. Davis
                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court